Filed 6/30/26  P. v. Washington CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B341337 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA137779-01) |
| v. | |
| VINCENT WASHINGTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa P. Magno, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez, Charles Lee, Michael C. Keller and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Vincent Washington appeals from the sentence imposed at his resentencing hearing conducted pursuant to Penal Code[1] section 1172.75, claiming the trial court erred by imposing the upper term sentence on one count and by failing to dismiss a firearm enhancement.  We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Over the course of a few weeks in 2015, Washington committed numerous nighttime armed robberies in which he approached victims on his bicycle, pointed a gun at them, and demanded money and property.  (*People v. Washington* (Apr. 24, 2019, B281901) [nonpub. opn.].)  Washington also shot one robbery victim who asked to keep his empty wallet for sentimental reasons.  (*Ibid.*)

In 2017, Washington was convicted of six counts of second degree robbery (§ 211) (counts 1–4, 8, 9) and one count of attempted willful, premeditated, and deliberate murder (§§ 664, subd. (a), 187, subd. (a)) (count 7).  The jury found Washington personally used a firearm (§ 12022.53, subd. (b)) for four of the robbery counts (counts 1–3, 9), and he personally and intentionally discharged a firearm, proximately causing great bodily injury (§ 12022.53, subds. (c) & (d)) in the attempted murder and the associated robbery involving the same victim (counts 7 and 8).

The court sentenced Washington to seven years to life in state prison with the possibility of parole on count 7 (attempted first degree murder), plus a consecutive term for the firearm enhancement of 25 years to life, for a total of 32 years to life.  On the robberies, the court imposed the upper term of five years on

---

[1]      All statutory references are to the Penal Code.

count 1, plus a 10-year consecutive term for the firearm enhancement; consecutive terms of 4 years, 4 months (one-third the midterm plus one-third the firearm enhancement) on each of counts 2, 3, and 9; consecutive terms of one year (one-third the midterm) on counts 4 and 8; and consecutive one-year terms for each of Washington's six prison priors pursuant to former section 667.5, subdivision (b). Washington's total sentence was 68 years to life in state prison. We affirmed the judgment on appeal. (*People v. Washington*, *supra*, B281901.)

Washington filed a motion for resentencing after the Legislature enacted section 1172.75, which invalidated all section 667.5, subdivision (b) enhancements imposed prior to January 1, 2020, other than those imposed for prior convictions of sexually violent offenses. (§ 1172.75, subd. (a).) He argued that multiple ameliorative changes in the law enacted after his original sentencing now applied: (1) limitations on enhancements under section 1385; (2) the discretion to strike firearm enhancements; (3) a presumptive middle term (§ 1170, subd. (b)(2)); and (4) a presumptive low term under certain enumerated circumstances (§ 1170, subd. (b)(6)). Washington asked the court to resentence him on the lesser included offense of attempted second degree murder on count 7 and to impose a term of seven years; run all other counts concurrently; and dismiss all firearm enhancements. Washington asserted the firearm enhancements should be dismissed because "the imposition of the enhancements in his case resulted in an aggregate term of over 20 years, the outcome resulted in racially disparate application, Mr. Washington has been in custody in this case . . . almost 9 actual years[], Mr. Washington has been an exemplary prisoner—with no need to have discipline imposed during the entire time he's been in

3

custody in this case, there is no proof Mr. Washington would be danger to public safety, there is ample proof Mr. Washington's release will further justice and benefit society, [and] Mr. Washington has strong family support."

The trial court recalled Washington's sentence and conducted a full resentencing. At resentencing, based on section 1172.75, subdivision (d)(4), the court concluded it was not required to engage in factfinding before imposing an upper term sentence on count 1 because it had imposed an upper term when Washington was originally sentenced. The court acknowledged its discretion to dismiss any enhancement in the interest of justice (§ 1385, subd. (c)(1)), and noted that in exercising its discretion it was required to consider and afford great weight to evidence offered by Washington to prove mitigating circumstances listed in section 1385, subdivision (c)(2)(A) through (I). The court further acknowledged that proof of one of those mitigating circumstances weighed greatly in favor of dismissing the enhancement, unless the court found dismissal of the enhancement would endanger public safety. (*Id*., subd. (c)(2).)

The trial court asked Washington's counsel to explain the basis for her contention that imposing the firearm enhancements would result in a racially disparate impact pursuant to section 1385, subdivision (c)(2)(A)). Washington's counsel responded, "Your Honor, I think that it's just a general argument that regarding mass incarceration and how our prisons are overwhelmingly filled with people of, you know, African American and Latin American descents." Counsel acknowledged "the amount of trauma, the seriousness of all these, you know, counts that Mr. Washington was convicted of regarding these incidences that happened back in 2015, but the enhancements, they're—

4

they're enhancements that you don't see applied to individuals the way they were applied back then, back in 2015. [¶] This is a case that I'm confident would have settled or somehow dispo'd in today's day, given . . . [¶] the district attorney, . . . all the case law, all the greater consideration for mitigation for, you know, I— I guess people in certain neighborhoods, the—the fact that they're arrested at a much greater rate and the sentences seem disproportionately larger than it would to others. [¶] It's a general argument.  I don't have any specifics.  But if we look at the—the makeup of state prison now, what we see are definitely black and brown people there at a much greater rate."

The prosecutor pointed out the sheer number of Washington's victims, the short time span of the crimes, the use of a firearm, and Washington's choice to shoot one victim at point blank range when he simply asked to keep his wallet.  He argued, "I don't see . . . how anybody who did the behavior that Mr. Washington was accused of—whether White, Asian, Black— would have had a different result or different filings."  The court observed that in its "15 years as a deputy district attorney, six years handling just murder cases and then in 10 years . . . on the bench, [it had] not seen any disparate treatment among the races when it comes to charging the gun use allegation."

Asked to address public safety, Washington's counsel argued Washington's exemplary conduct while in custody—he had no disciplinary incidents in nine years of state prison at Pelican Bay—indicated he was no longer a danger to society.  She asked the court to reduce his attempted first degree murder conviction to attempted second degree murder and sentence him to time served.  In the alternative, she requested the court strike all the firearm enhancements pursuant to section 1385 and

5

sentence him concurrently on the robbery counts, for a total term of 17 years to life in state prison.

The prosecutor opposed sentencing Washington to time served and urged the court to reimpose Washington's original sentence except for the now-invalid one-year prison priors. He highlighted the violence involved in Washington's crime spree, "basically sticking the gun in the face of people at vulnerable times; when they're by themselves," and the "incredible callousness" Washington showed by shooting the victim who asked to retain his wallet once it was emptied because it had belonged to a deceased friend. He argued that while it was commendable that Washington had done well in prison, commuting the sentence to time served would be inconsistent with the facts found by the jury.

The court concluded striking all the firearm enhancements would endanger public safety, noting that of all the nonhomicide cases the court had handled, "this is probably one of the worst." The court pointed out Washington committed numerous robberies, most with a gun; all the victims were particularly vulnerable in that they usually were alone, at night, in residential driveways or garages; and Washington exploited their vulnerability to rob them. The crimes involved great violence, great bodily harm, threats of great bodily harm, and acts disclosing a high degree of cruelty, viciousness or callousness. Washington used more force than was necessary to accomplish the robbery, choosing to violate, terrorize, and injure his victims; and, most egregiously, he shot and nearly killed the compliant victim who merely asked to keep a wallet. Moreover, Washington had engaged in essentially continuous criminal conduct from 1990 to 2015, racking up 11 felony convictions and 13

misdemeanor convictions, serving six separate prison terms, and performing poorly on probation and parole.

Although the court concluded dismissing the gun enhancements in their entirety would endanger public safety, it dismissed the firearm enhancements attached to the robbery counts in recognition of Washington's outstanding conduct in prison. The court struck the six section 667.5, subdivision (b) priors. It reimposed the original indeterminate sentence on count 7, seven years to life plus 25 years to life under section 12022.53, subdivision (d). The court reimposed the upper term sentence of five years on count 1 and sentenced him to one year, consecutive, for each of the remaining robbery convictions, for a total determinate sentence of 10 years. Washington's total sentence was 42 years to life in state prison. He appeals.

**DISCUSSION**

I.      *Upper Term Sentence on Count 1*

Section 1170, subdivision (b)(2) establishes a presumptive midterm determinate sentence and permits imposition of upper term sentences only when the facts underlying aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt at trial. At resentencing hearings triggered by a sentence that includes prior prison term enhancements that are no longer valid, section 1172.75, subdivision (d)(4) provides, "Unless the court originally imposed the upper term, the court may not impose a sentence exceeding the middle term unless there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and those facts have been stipulated to by the

7

defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

The appellate courts are split on how to reconcile these two statutes. (See *People v. Brannon-Thompson* (2024) 104 Cal.App.5th 455 (*Brannon-Thompson*); *People v. Gonzalez* (2024) 107 Cal.App.5th 312 (*Gonzalez*).) On the one hand, the *Brannon-Thompson* court held that section 1172.75, subdivision (d)(4) creates an exception to section 1170, subdivision (b)(2)'s burden of proof requirement for the imposition of an upper term sentence in those cases in which an upper term was imposed at the original sentencing, finding it evident from the statute's plain language that "the Legislature intended the new burden of proof amendments to section 1170, subdivision (b) apply only if the trial court is imposing the upper term for the first time at a section 1172.75 resentencing." (*Brannon-Thompson*, at pp. 466–467; see also *People v. Mathis* (2025) 111 Cal.App.5th 359, 373–374, review granted Aug. 13, 2025, S291628 (*Mathis*).)

On the other hand, the *Gonzalez* court held section 1170, subdivision (b)(2)'s burden of proof requirement applies when reimposing an upper term at a section 1172.75 resentencing hearing. (*Gonzalez, supra*, 107 Cal.App.5th at p. 331.) That court understood the first clause of section 1172.75, subdivision (d)(4) to define the class of defendants eligible for an upper term sentence—only those who were originally sentenced to such a term—while the second clause incorporates section 1170, subdivision (b)(2)'s burden of proof requirement, which must be applied before the court may reimpose an upper term sentence. (*Gonzalez*, at pp. 329–331.)

The California Supreme Court will consider the question in *People v. Eaton*, review granted May 14, 2025, S289903. Until we receive the Supreme Court's guidance on this topic, we agree with and follow *Brannon-Thompson*'s interpretation of section 1172.75, subdivision (d)(4). Section 1172.75, subdivision (d)(4)'s first clause, "Unless the court originally imposed the upper term," expressly excepts a class of defendants—those originally sentenced to an upper term—from the second clause's burden of proof requirement. Thus, if a defendant was originally sentenced to an upper term, section 1172.75, subdivision (d)(4) allows the court to reimpose the upper term at resentencing, without engaging in any factfinding or otherwise complying with section 1170, subdivision (b)'s burden of proof requirements for imposing an upper term sentence. (*Brannon-Thompson*, *supra*, 104 Cal.App.5th at pp. 466–467; *Mathis*, *supra*, 111 Cal.App.5th at p. 374; see also *People v. Moss* (2026) 120 Cal.App.5th 375, 380 [Legislature intended § 1172.75, subd. (d)(4) "to limit the otherwise broad, ameliorative scope of a section 1172.75 resentencing, and . . . [it] could so limit the scope of relief for defendants with already-imposed, proper upper term sentences without generating new constitutional concerns under *Apprendi*" *v. New Jersey* (2000) 530 U.S. 466].)

Washington contends our construction of section 1172.75, subdivision (d)(4) violates his constitutional right to equal protection. Specifically, he argues defendants resentenced under section 1172.75, and who therefore are subject to the section 1172.75, subdivision (d)(4) exception, are similarly situated to and treated differently than defendants whose unauthorized sentences are corrected and defendants who are resentenced pursuant to section 1170.18 or section 1172.1, to whom the

9

section 1172.75, subdivision (d)(4) exception does not apply. He argues the disparate treatment of resentenced defendants violates equal protection because "[t]he Legislature has arbitrarily chosen to make the sentencing procedure for defendants resentenced under section 1172.75 more difficult than for other defendants who are resentenced."

Washington acknowledges, and we agree, that because his equal protection challenge does not implicate a suspect class or a fundamental right, rational basis review applies. (See *People v. Hardin* (2024) 15 Cal.5th 834, 847 (*Hardin*).) "Under this deferential standard, we presume that a given statutory classification is valid 'until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable.' [Citation.] The underlying rationale for a statutory classification need not have been 'ever actually articulated' by lawmakers, nor 'be empirically substantiated.' [Citation.] Evaluating potential justifications for disparate treatment, a court reviewing a statute under this standard must 'treat the statute's potential logic and assumptions far more permissively than with other standards of constitutional or regulatory review.' [Citation.] 'If a plausible basis exists for the disparity, courts may not second-guess its " 'wisdom, fairness, or logic.' " ' " (*Id.* at p. 852.)

Given the purpose and operation of section 1172.75, we can easily conceive of a rational basis for its disparate treatment of defendants resentenced under that law whose original sentence imposed upper terms. The Legislature's "primary concern" in enacting section 1172.75 was "not merely with sentencing uniformity in the abstract" but to align the treatment of defendants with section 667.5, subdivision (b) prior prison term enhancements (other than for sexually violent offenses) imposed

10

before 2020—when those enhancements were still valid—with the treatment of those sentenced after 2020, when such enhancements were eliminated prospectively. (*People v. Rhodius* (2025) 17 Cal.5th 1050, 1066 (*Rhodius*).) The Legislature rationally could have concluded section 1172.75 advanced its goal to retroactively eliminate prior prison term enhancements while providing defendants the benefit of ameliorative changes to the law, therefore including the factfinding requirements for imposition of a new upper term while conserving judicial resources by exempting existing upper term sentences from the new factfinding requirements. (See *People v. Chatman* (2018) 4 Cal.5th 277, 290 [preserving governmental resources is a legitimate state interest], modified on other grounds in *Hardin*, *supra*, 15 Cal.5th at pp. 850–851.) The law's disparate treatment of certain classes of defendants serves the legitimate goal of judicial economy by avoiding retrials on aggravating factors already found true under a constitutionally valid sentencing scheme.

The fact that the law fails to achieve uniformity of sentencing across all classes of defendants does not reflect arbitrary treatment for purposes of an equal protection claim. "[A]*ny* retroactive sentencing remedy confined to a particular group of defendants will inevitably undermine uniformity in some ways—even as it promotes it in others." (*Rhodius*, *supra*, 17 Cal.5th at p. 1066.) Because the challenged classification bears a reasonable relationship to a legitimate state purpose, Washington's equal protection claim fails.

11

II.    *Failure to Dismiss Section 12022.53, Subdivision (d) Enhancement*

When the Legislature amended section 1385 in 2021 to give trial courts the authority to dismiss sentence enhancements in the furtherance of justice, it also established a series of mitigating circumstances, which, if proven, "weigh[] greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2); Stats. 2021, ch. 721, § 1.)  First in the list of mitigating circumstances is that "[a]pplication of the enhancement would result in a discriminatory racial impact as described in paragraph (4) of subdivision (a) of Section 745," the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1) (RJA).  (§ 1385, subd. (c)(2)(A).)

The RJA, enacted to eliminate racial bias from California's criminal justice system and to ensure race plays no role in seeking or obtaining convictions or in sentencing, prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the basis of race, ethnicity, or national origin.  (*People v. Wilson* (2024) 16 Cal.5th 874, 944–945 (*Wilson*).)  Section 745, subdivision (a)(4), the portion of the RJA to which section 1385, subdivision (c)(2)(A) refers, provides that the RJA is violated when a "longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for that offense" either "on people that share the defendant's race, ethnicity, or national origin than on defendants of other races, ethnicities, or national origins" (§ 745, subd. (a)(4)(A)), or "on defendants in cases with victims of one race, ethnicity, or

12

national origin than in cases with victims of other races, ethnicities, or national origins" (*id*., subd. (a)(4)(B)), in the county where the sentence was imposed.

While the trial court must "consider and afford great weight to evidence offered by the defendant to prove" a mitigating circumstance applies, it is the defendant's duty to present such evidence. (§ 1385, subd. (c)(2).) Washington offered no evidence tending to prove the imposition of the firearm enhancements would result in a discriminatory racial impact as described in section 745, subdivision (a)(4). The RJA was a mere conclusory phrase in the motion for resentencing: Washington did not devote even a single sentence to it, much less identify which racially disparate impact was being asserted—section 745, subdivision (a)(4)(A) or (B), or both—and none of the evidence submitted with the resentencing motion pertained to the racial impact of any charges or enhancements. Consistent with this cursory claim, at the resentencing hearing Washington's counsel acknowledged she did not "have any specifics," just a "general argument" that California "prisons are overwhelmingly filled with people of, you know, African American and Latin American descents," and then she offered her personal beliefs that "you don't see" the firearms enhancements for these armed robberies and attempted murder imposed in the present day like they were in 2015 and that this case would have "settled or somehow dispo'd in today's day."

Counsel's general observation concerning population percentages in the California prison system as a whole and her anecdotal belief that attitudes toward firearm enhancements have changed fall far short of evidence that failing to dismiss the firearm enhancements would result in a longer or more severe sentence being imposed on Washington than was imposed on

13

other similarly situated individuals convicted of the same offenses, and longer or more severe sentences were more frequently imposed for those offenses either on Black defendants as opposed to defendants of other races, ethnicities, or national origin (§ 745, subd. (a)(4)(A)), or on defendants in cases with victims of one race, ethnicity, or national origin than in cases with victims of other races, ethnicities, or national origins (*id*., subd. (a)(4)(B)) in Los Angeles County. Simply put, Washington did not give the court any evidence for it to "consider and afford great weight to" (§ 1385, subd. (c)(2)) when determining whether he had proven the existence of this mitigating factor. The trial court, therefore, did not err when it declined to dismiss the firearm enhancements on this ground.[2]

Apparently recognizing this evidentiary void, Washington requests we take judicial notice of a 2023 report entitled, "Sentence Enhancements in California," by the Committee on Revision of the Penal Code. He asserts this court may judicially notice this document because it is a report by a government agency (Evid. Code, § 452, subd. (c); *People v. Fuentes* (2023) 87 Cal.App.5th 1286, 1298, fn. 10), and he claims its contents are sufficient to make a prima facie showing of a violation of the RJA.

We deny the request to take judicial notice of this document, which was not part of the record at the time the judgment was entered. " '[A]n appellate court generally is not the forum in which to develop an additional factual record.' " (*People*

---

[2]    The trial court ultimately dismissed all but one of the firearm enhancements in recognition of Washington's flawless disciplinary record in state prison, leaving only the 25-year-to-life enhancement imposed under section 12022.53, subdivision (d) to be considered on appeal.

*v. Castillo* (2010) 49 Cal.4th 145, 157.)  " '[A]n appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.]  This rule reflects an 'essential distinction between the trial and the appellate court . . . that it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law.' " (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.)  Therefore, " '[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court' absent exceptional circumstances." (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2.)  Washington does not contend any exceptional circumstances apply, and we do not perceive any justification to deviate from this general rule.  Moreover, even if we were to take judicial notice of this report, doing so would not establish the truth of its contents.  (*Castillo*, at p. 157 ["although 'courts may notice official acts and public records, "we do not take judicial notice of the truth of all matters stated therein" ' "].)

Finally, we note that Washington inaccurately treats this appeal as though it were an appeal from the denial of a petition made under section 745, subdivision (b), as he requests remedies under section 745 and suggests this court remand the matter to the trial court with directions to order a remedy for the violation of the RJA or for an evidentiary hearing.  Washington, however, did not file a motion pursuant to section 745, subdivision (b)—he filed a motion for resentencing pursuant to section 1172.75 that briefly referenced "racially disparate application" under section 1385, subdivision (c)(2)(A) as a mitigating factor in support of his request that enhancements be dismissed at resentencing.  RJA claims may be raised on direct appeal only if they are based on

15

the trial record (§ 745, subd. (b); *Wilson*, *supra*, 16 Cal.5th at p. 948 [defendant "may raise an RJA claim on direct appeal from the conviction or sentence, provided the claim is based on the trial record"]), and here, Washington has attempted to present evidence outside the trial record by means of judicial notice. Under section 745, subdivision (b), the proper method for raising "extrarecord RJA claims" is a petition for habeas corpus, the "standard vehicle for developing and presenting claims of error in the judgment based on evidence outside the appellate record." (*Wilson*, at pp. 948, 960; see *id.* at p. 955 [RJA's habeas provision allows "defendants whose RJA claims are independent of the claims on appeal a timely opportunity to raise extrarecord RJA claims without regard to the status of proceedings on appeal"].) Without prejudice to Washington raising RJA claims by petition of habeas corpus, we decline his request on direct appeal that we grant relief for an RJA violation or remand for further proceedings under the RJA.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

WILEY, J.                                            SCHERB, J.

16